## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1) LAND 2 AIR INVESTMENTS LLC,  )
as successor entity by conversion to  )
LAND 2 AIR INVESTMENTS LP and as  )
successor to LAND 2 AIR INVESTMENTS  )
LLP,  )
    )    CASE NO.:  21-cv-00231 JED-JFJ
        Plaintiff,  )
    )
v.  )
    )
(1) FLYING CPA, LLC,  )
(2) LONI WOODLEY, and  )
(3) SAKER AVIATION SERVICES, CO.,  )
    )
        Defendants.  )

## COMPLAINT

Plaintiff Land 2 Air Investments LLC ("Land 2 Air"), for its Complaint against Defendants Flying CPA, LLC ("FCPA"), Loni Woodley ("Woodley") and Saker Aviation Services, Co., ("Saker Aviation") (collectively, "Defendants"), and in support thereof alleges as follows:

## JURISDICTION, VENUE AND PARTIES

1.    This case is for damages in excess of $100,000.00, exclusive of attorney fees, costs, and is within this Court's Subject Matter Jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) as this is an action for damages in excess of $75,000.00, exclusive of interest and costs, and there is complete diversity between the parties. To the extent a claim does not fall within the Court's jurisdiction as set forth above, the Court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.    Venue for this civil action is proper in the Northern District of Oklahoma pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise

to the claims alleged herein occurred in Tulsa, Oklahoma, and/or because Defendants are subject to the Court's personal jurisdiction with respect to this action.

3.     Plaintiff Land 2 Air Investments LLC is a Texas limited liability company.  Land 2 Air Investments LLC is the successor entity by conversion of Land 2 Air Investments LP and successor to Land 2 Air Investments LLP. Land 2 Air Investments LLC (hereinafter "Land 2 Air") has full authority to bring this action and asserts these claims on behalf of itself and the predecessor entities. Land 2 Air has a principal place of business located at 151 Players Circle, Suite 100, Southlake, TX 76092.

4.     Defendant Flying CPA, LLC ("FCPA") is a Colorado limited liability company with its principal place of business at 455 E. Pikes Peak, Suite 305, Colorado Springs, CO 80903. FCPA may be served with process to its registered agent Loni Woodley at the entity's principal place of business.

5.     At all material times, FCPA is subject to the personal jurisdiction of this Court as an entity operating, conducting, engaging in or carrying out a business venture in the State of Oklahoma or having an office or agent in Oklahoma:

     a.   Operating, conducting, engaging in, or carrying on a business, business purchase, or business venture in this state or having an office or agency in this state;

     b.   Committing a tortious act in this state;

     c.   Owning, using, possessing or holding a mortgage or other lien on real property within this state;

     d.   Engaging in substantial and not isolated activity within this state;

     e.   Causing injury to persons or property within this state arising out of an act or omission by the Defendant outside this state;

    f.   Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state;

    g.   Entering into a contract that was executed under and to be construed under the laws of the state of Oklahoma; and

    h.   Other acts or omissions to be revealed throughout the course of discovery.

6.      Defendant Loni Woodley ("Woodley") is an individual who, upon information and belief, is a resident and citizen of Oklahoma and/or Arizona. Upon information and belief, Woodley is the owner of residences in both Oklahoma and Arizona.

7.      At all material times, Woodley is subject to the personal jurisdiction of this Court as an individual operating, conducting, engaging in or carrying out a business venture in the State of Oklahoma or having an office or agent in Oklahoma:

    a.   Operating, conducting, engaging in, or carrying on a business, business purchase, or business venture in this state or having an office or agency in this state;

    b.   Committing a tortious act in this state;

    c.   Owning, using, possessing or holding a mortgage or other lien on real property within this state;

    d.   Engaging in substantial and not isolated activity within this state;

    e.   Causing injury to persons or property within this state arising out of an act or omission by the Defendant outside this state;

    f.   Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state;

    g.   Entering into a contract that was executed under and to be construed under the laws of the state of Oklahoma; and

      h.   Other acts or omissions to be revealed throughout the course of discovery.

8.      Defendant Saker Aviation Services Company ("Saker Aviation") is a Nevada corporation with its principal place of business in New York, New York. Saker Aviation may be served with process to its registered agent, Sierra Corporate Services, Attention Micki Arguello, 100 W. Liberty Street, 10th Floor, Reno, Nevada 89501.

9.      At all material times, Saker Aviation is subject to the personal jurisdiction of this Court as an entity operating, conducting, engaging in or carrying out a business venture in the State of Oklahoma or having an office or agent in Oklahoma:

      a.   Operating, conducting, engaging in, or carrying on a business, business purchase, or business venture in this state or having an office or agency in this state;

      b.   Committing a tortious act in this state;

      c.   Causing injury to persons or property within this state arising out of an act or omission by the Defendant outside this state

      d.   Producing materials, or things processed, serviced, or manufactured, used or consumed within this State in the ordinary course of commerce, trade, or use;

      e.   Owning, using, possessing or holding a mortgage or other lien on real property within this state;

      f.   Engaging in substantial and not isolated activity within this state;

      g.   Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state;

      h.   Entering into a contract that was executed under and to be construed under the laws of the state of Oklahoma; and

      i.   Other acts or omissions to be revealed throughout the course of discovery.

## GENERAL ALLEGATIONS

10.   In spring 2019, the owners of Land 2 Air became interested in purchasing a Cirrus aircraft.   Neither Land 2 Air nor any of its members had ever previously purchased a Cirrus aircraft.

11.   Land 2 Air first learned of the availability for sale of a 2006 Cirrus SR22 Turbo, Registration No. N-919SC, Serial Number 2112 (the "Aircraft") when it was advertised on an aircraft secondary market website known as Controller.com.

12.   In its online advertisements, the Aircraft was identified as being for sale by Woodley in Tulsa, Oklahoma.  The Aircraft was described as having an "8 out of 10" rating for its airframe, its exterior and its interior.  It was also identified as having a "newly overhauled" engine.

13.   The advertisement did not disclose that the Aircraft had been salvaged from a previous crash, nor did it indicate that the Aircraft's tail number had been changed.

14.   Land 2 Air member Derick Murway ("Murway") contacted FCPA/Woodley for more information and to discuss possible terms of sale.

15.   On or about May 24, 2019, Woodley flew the Aircraft to Texas to meet with Murway and Land 2 Air member Farrukh Azim, and to provide a test flight of the Aircraft.

16.   Shortly after the May 24, 2019 meeting, FCPA/Woodley sent Land 2 Air a proposed purchase agreement (the "Purchase Agreement") for the sale of the Aircraft.

17.   On May 29, 2019, Land 2 Air sent FCPA/Woodley an executed version of the Purchase Agreement which had been annotated and initialed by Murway.

18.   Specifically, Murway  included the statement "Need to Discuss" to the end of Section 5, which was the part of the Purchase Agreement addressing pre-purchase inspections.

Murway's annotation was in response to ongoing discussions regarding the maintenance and inspections that FCPA/Woodley previously had performed on the Aircraft.

19.    Upon receiving Land 2 Air's annotated Purchase Agreement, FCPA/Woodley identified Jon Crotts ("Crotts") of Saker Aviation Services ("Saker Aviation") in Garden City, Kansas, as the person most knowledgeable of both the maintenance history and current condition of the Aircraft.

20.    FCPA/Woodley indicated that Saker Aviation and Crotts had done most of the maintenance on the Aircraft for the "past several years," and that Saker Aviation was the entity that had installed the Aircraft's overhauled engine.  FCPA/Woodley also pointed out that Saker Aviation had performed the Aircraft's two most recent annual certification inspections, the most recent of which was completed in April 2019.

21.    FCPA/Woodley invited Land 2 Air to communicate directly with Crotts regarding the Aircraft's condition and maintenance history.

22.    Because the Aircraft's annual certification inspection had been completed within the prior 60 days, FCPA/Woodley suggested that, rather than conduct another full inspection of the Aircraft, Land 2 Air should go to Saker's Garden City, Kansas location to meet with Crotts and possibly other Saker Aviation personnel so that Land 2 Air could ask questions about the Aircraft and attend a service walkthrough.

23.    In response, Murway traveled to Garden City, Kansas in early June 2019 and met with Saker Aviation representatives who took Murway through a detailed walkthrough of the engine and airframe. Murway was advised that, as a result of the Aircraft having had its annual certification inspection on April 9, 2019, the Aircraft was airworthy.

24.    In reliance on the information, disclosures and representations made by FCPA/Woodley, Saker Aviation and Crotts regarding the inspection history, certification status and airworthiness of the Aircraft, Land 2 Air decided to move forward with the purchase.

25.    Land 2 Air closed the sale transaction and took delivery of the Aircraft and its logbook and maintenance records on or around July 16, 2019.  Prior to closing, Land 2 Air had not been given access to the maintenance records or logbook.

26.    Following receipt of the Aircraft, and through March 2020, Land 2 Air used the Aircraft intermittently, flying it only approximately an additional forty to fifty hours.

27.    In March 2020, Land 2 Air flew the Aircraft to the Cirrus Design Facility Service Center (the "Cirrus Service Center" or "Cirrus") in McKinney, Texas, to obtain the Aircraft's next annual certification inspection.  That inspection was the first annual certification inspection of the Aircraft since Land 2 Air purchased it in July 2019.

28.     Land 2 Air left the Aircraft at the Cirrus Service Center, expecting to retrieve it following completion of the annual certification inspection. After several weeks, Land 2 Air was finally contacted by representatives of Cirrus on or about April 20, 2020.

29.    At that time, Land 2 Air was instructed by Cirrus personnel to arrange for the Aircraft to be picked up from the Cirrus Service Center.  Land 2 Air was informed that the annual inspection could not be completed, and that the Aircraft could not be operated because it had previously been "attritted" by Cirrus and was considered to be a "counterfeit airplane."

30.    Cirrus explained that being "attritted" meant that the Aircraft had been added to an official listing of airplanes that were so substantially damaged or destroyed during an incident that Circus considered them to be un-airworthy and non-repairable, resulting in Cirrus permanently de-listing the airplane's serial number and removing it from service.

31.    Cirrus further explained that because an attritted airplane was deemed to be a counterfeit, Cirrus would neither provide certified parts nor allow any certified work, including annual certification inspections, to be performed on it.

32.    Cirrus also explained that, after performing nearly seventy (70) hours of the annual inspection, it only discovered the "attritted" status of the Aircraft after realizing that the Aircraft's tail number had been changed from 205KT to 919SC.

33.    Despite the Aircraft's status, and the fact that it could not now complete the inspection, Cirrus nevertheless shared the results of its inspection with Land 2 Air.

34.    One of the many concerns Cirrus identified was its discovery that the Aircraft's aileron cables (the cables that tether the wings and control their flaps) were not Cirrus certified parts and did not comply with Cirrus's installation standards because the cables, which Cirrus requires to be contained in a housing to avoid abrasion that could cause loss of function during flight, were completely unprotected.

35.    Another concern was the condition of the Aircraft's firewall, which Cirrus pointed out was cracked in what appeared to Cirrus to have been  an earlier crash which also appeared to damage the Aircraft's fuselage, wings and propellers.  Perhaps most egregious was Cirrus' observation that the Aircraft had an unauthorized, counterfeit wing assembly, which Cirrus determined had been installed at a location other than Cirrus's Duluth, Minnesota headquarters— the only location in North America authorized to install a fixed-wing assembly of the type found on the Aircraft.

36.    Cirrus's representatives expressed disbelief that the Aircraft had passed any prior yearly inspections, as any of the major issues discovered during Cirrus' inspections could have served as the basis for  treating the Aircraft as a "destroyed or scrapped" aircraft under FAA Order

8100.19, the FAA regulation designed to prevent an owner or operator from returning a crashed aircraft to service or representing it as being airworthy.

37.   Cirrus sent Land 2 Air a Customer Invoice/Work Order specifically stating that Cirrus considered the Aircraft to be a "counterfeit aircraft," for which no annual inspection could be completed. The Invoice/Work Order advised Land 2 Air that the Aircraft was restored to the same configuration as when it arrived to Cirrus's McKinney facility, where the Aircraft has remained stored.

38.   Following receipt of the results of Cirrus' inspection, Land 2 Air decided to undertake a deeper investigation into the Aircraft's history prior to Land 2 Air's purchase.

39.   This investigation began with reference to the Aircraft's logbooks, which Land 2 Air was not given prior to closing and from which no information had previously been disclosed. Per the logbooks, a significant amount of the work performed on the Aircraft during FCPA/Woodley's tenure as owner was completed at Riverside Aviation ("Riverside"), a Tulsa, Oklahoma aircraft maintenance facility. Most of the work had been performed by Riverside's owner, David Landreth ("Landreth"). FCPA/Woodley never informed Land 2 Air of any work performed by Riverside or Landreth during FCPA/Woodley's period of ownership.

40.   In response to inquiry, Landreth informed Land 2 Air that Riverside performed repairs and maintenance work on the Aircraft at the direction and request of FCPA/Woodley from approximately April 2017 to August 2017. Landreth also informed Land 2 Air that, in conducting the Aircraft's July 24, 2017 annual certification inspection, Riverside discovered numerous issues and concerns, including several that would also be raised by Cirrus in its April 2020 inspection.

41.   Landreth explained that Riverside informed FCPA/Woodley that the Aircraft incorporated several non-Cirrus certified parts, including wings which Landreth pointed out were not part of the original airframe.

42.   Landreth informed Land 2 Air that he had advised FCPA/Woodley, based on the extent of counterfeit parts used and the non-compliant manner in which many had been installed, that it appeared to Landreth that the Aircraft had previously suffered significantly damage and had possibly been destroyed in a crash.

43.   According to Landreth, FCPA/Woodley ignored Landreth's input and refused his requests that any counterfeit parts be replaced with Cirrus-certified parts and that the Aircraft be overhauled to comply with Cirrus's maintenance standards. Instead, FCPA/Woodley simply removed the Aircraft from Riverside's possession and moved it to Saker Aviation's Garden City, Kansas location.

44.   Saker Aviation's work included, *inter alia*, conducting two annual inspections on the Aircraft at FCPA/Woodley's request.  The first of these inspections was the annual certification inspection conducted on July 23, 2018.  Saker Aviation's second annual certification inspection was not scheduled to occur until July of 2019, but instead was performed only nine months after the first, on April 4, 2019.  Both the 2018 and 2019 inspections were performed by the same Saker Aviation employee, Edward R. Adams, who, after each inspection, put entries into the logbook stating that the Aircraft had been inspected in accordance with the requirements for an annual inspection and found to be in airworthy condition.

45.   Despite being fully aware of the concerns raised by mechanics at Riverside Aviation, including the likelihood that the Aircraft had previously been seriously damaged or destroyed in a possible crash, FCPA/Woodley only informed Land 2 Air of the routine

maintenance, minimal repairs and favorable inspections provided by Saker Aviation. FCPA/Woodley gave no indication to Land 2 Air of the Aircraft's possible crash history.

46.    When questioned about the Aircraft's history, FCPA/Woodley never mentioned or referenced Riverside or Landreth, and never provided the Aircraft's logbooks.   Instead, FCPA/Woodley directed Land 2 Air to Saker Aviation.

47.    FCPA/Woodley's misdirection and lack of transparency was done for the purpose or with the intent that Land 2 Air, an unsophisticated airplane purchaser, would forego conducting its own separate inspection or investigation of the Aircraft in lieu of relying on the information and representations provided by FCPA/Woodley, Saker Aviation and/or Crotts.

48.    At no point did FCPA/Woodley, Saker Aviation or Crotts inform or otherwise make Land 2 Air aware that the Aircraft had possibly been seriously damaged or destroyed in a prior crash, or, consequently, had its serial number "attritted" by Cirrus.

49.    At no point did FCPA/Woddley, Saker Aviation or Crotts inform or otherwise make Land 2 Air aware that the Aircraft's tail number had been changed from its original number to the one it now bears.

50.    Having now been attritted, removed from service and deemed a "counterfeit," Land 2 Air is left with an Aircraft that can neither be put into service nor supplied Cirrus-certified parts or service. With entries reflecting the same in its logbook, the Aircraft cannot now be sold for anything greater than salvage parts, leaving Land 2 Air holding nothing more than an expensive paperweight for which it has incurred total costs in excess of $350,000.

## COUNT I: FRAUD
### (Against Defendants FCPA and Woodley)

51.    Land 2 Air re-alleges paragraphs 1 through 50 as if fully set forth herein.

52.     As the seller of the Aircraft, FCPA and Woodley, individually, jointly and severally, owed to Land 2 Air a duty of full disclosure with respect to any prospective buyer of the Aircraft.

53.     Prior to the sale of the Aircraft to Land 2 Air, FCPA/Woodley were aware of some or all of the following conditions, including: (i) that the Aircraft contained serious mechanical issues, including but not limited to its use and incorporation of non-Cirrus certified "counterfeit" parts;  (ii) that the Aircraft had sustained significant damage and possibly been destroyed in a prior incident; (iii) that the Aircraft had its original tail numbers removed and replaced; and (iv) that the Aircraft had been attritted by Cirrus and deemed un-repairable and not airworthy.

54.     Prior to entering into the Aircraft Purchase Agreement with Land 2 Air, FCPA/Woodley had a duty to affirmatively disclose to Land 2 Air the existence of these facts, and/or to refrain from withholding or misrepresenting facts and information which, if not withheld or misrepresented, could have been utilized by Land 2 Air to discover these relevant issues.

55.     FCPA and Woodley knew that its representations regarding the condition and airworthiness of the Aircraft were material representations upon which Land 2 Air relied in its agreement to purchase the Aircraft and forgo its own third-party inspection of or investigation into the Aircraft.

56.     FCPA's and Woodley's intentional refusal to disclose to Land 2 Air the above-described issues and problems with the Aircraft prior to closing the sale of the Aircraft was material in that Land 2 Air would never have entered into the Aircraft Purchase Agreement with FCPA/Woodley had FCPA/Woodley apprised Land 2 Air of the above-described issues.

57.    FCPA's/Woodley's lack of transparency was done for the purpose or with the intent that Land 2 Air, an unsophisticated airplane purchaser, would forego conducting its own separate inspection in lieu of relying on the information and representations provided by FCPA/Woodley.

58.    By persuading Land 2 Air to refrain from performing its own independent inspection of or investigation into the Aircraft and instead rely on the Aircraft's recently completed annual certification inspection as well as information disclosed solely by FCPA/Woodley and Saker Aviation, FCPA/Woodley was able to make material misrepresentations of fact regarding the condition and airworthiness of the Aircraft, and also conceal relevant and important information about the Aircraft's maintenance history, certification status and airworthiness that, had such information been disclosed to Land 2 Air, would have resulted in Land 2 Air refusing to close the transaction.

59.    At no point did FCPA/Woodley inform or otherwise make Land 2 Air aware that the Aircraft had possibly been seriously damaged or destroyed in a prior crash, or, consequently, had its serial number "attritted" by Cirrus.

60.    Likewise, FCPA/Woodley did not give Land 2 Air access to the maintenance records or logbook prior to closing.

61.    As a direct consequence of each of FCPA's and Woodley's material misrepresentations and omissions, Land 2 Air suffered significant damages. Specifically, having now been attritted, removed from service and deemed a "counterfeit," Land 2 Air is left with an Aircraft that can neither be put into service nor supplied Cirrus-certified parts or service. With entries reflecting the same in its logbook, the Aircraft cannot now be sold for anything greater than salvage parts, leaving Land 2 Air holding nothing more than an expensive paperweight for which it has incurred total costs in excess of $350,000.

62.    WHEREFORE, Land 2 Air demands judgment for its damages in an amount in excess of $75,000.00, including punitive damages, and including interest, costs, and attorney fees against the Defendants FCPA and Woodley and for such other and further relief that this Court deems just and proper.

### COUNT II: BREACH OF CONTRACT
### (Against Defendants FCPA and Woodley)

63.    Land 2 Air generally re-alleges paragraphs 1 through 62, as if fully set forth herein.

64.    FCPA, Woodley and Land 2 Air entered into the Aircraft Purchase Agreement.

65.    FCPA and Woodley breached the Agreement by, without limitation, failing to disclose to Land 2 Air the existence of the known issues with regard to counterfeit parts and mechanical and maintenance issues related to the Aircraft, and by failing to deliver to Land 2 Air a valid FAA Certificate of Airworthiness, as required by the Agreement.

66.    FCPA's and Woodley's breaches of contract caused direct harm to Land 2 Air in that Land 2 Air would not have entered into the Agreement had FCPA and Woodley upheld their obligations under the Agreement, and had FCPA and Woodley informed Land 2 Air of the unairworthy condition of the Aircraft.

67.    As a result of FCPA's and Woodley's breaches of the Agreement, Land 2 Air has suffered significant damages. Specifically, having now been attritted, removed from service and deemed a "counterfeit," Land 2 Air is left with an Aircraft that can neither be put into service nor supplied Cirrus-certified parts or service. With entries reflecting the same in its logbook, the Aircraft cannot now be sold for anything greater than salvage parts, leaving Land 2 Air holding nothing more than an expensive paperweight for which it has incurred total costs in excess of $350,000.

68.   WHEREFORE, Land 2 Air demands judgment for its damages in an amount in excess of $75,000.00, including interest, costs, and attorney fees against the Defendants FCPA and Woodley and for such other and further relief that this Court deems just and proper.

### COUNT III: NEGLIGENCE / PROFESSIONAL NEGLIGENCE / NEGLIGENCE PER SE
**(Against Defendants FCPA and Woodley)**

69.   Land 2 Air generally re-alleges paragraphs 1 through 68, as if fully set forth herein.

70.   By failing to: a)  disclose the existence of extensive maintenance and repair issues with regard to the Aircraft, b) disclose the existence of counterfeit/non-Cirrus compliant parts in the Aircraft, c) disclose the likely crash history of the Aircraft, or, consequently, the fact that the Aircraft's serial number had been "attritted" by Cirrus, d) failing and refusing to deliver or allow Land to 2 Air to access the Aircraft's maintenance records or logbooks prior to the purchase, and e) disclosing that the Aircraft's tail number had been changed from its original, FCPA and Woodley  breached the duty of reasonable care owed to Land 2 Air.

71.   FCPA and Woodley failed to advise Land 2 Air of the inherent condition of the Aircraft, and such condition should have been disclosed by FCPA and Woodley without the requirement that Land 2 Air ask FCPA and Woodley about the condition of the Aircraft prior to the purchase.

72.   Further, FCPA and Woodley, after having been asked by Land 2 Air specific questions with regard to the condition and airworthiness of the Aircraft, were required to disclose accurate and reliable information to Land 2 Air.

73.   FCPA's and Woodley's negligent failure to inform Land 2 Air of the above-described problems with regard to the Aircraft caused direct harm to Land 2 Air in that Land 2

Air would not have entered into the Agreement with FCPA/Woodley had FCPA and Woodley disclosed the full extent of their knowledge about the Aircraft to Land 2 Air.

74.     FCPA and Woodley owed a duty to Land 2 Air and any other potential purchaser of the Aircraft to advise the purchaser that they are purchasing an un-airworthy Aircraft that is unsafe to fly, and that flight in the Aircraft could result in serious injury or death due to known maintenance and repair issues related to the Aircraft.

75.     FCPA and Woodley owed a duty to Land 2 Air and any other potential purchaser of the Aircraft to advise the purchaser that they are purchasing an aircraft that can neither be put into service nor supplied Cirrus-certified parts or service.

76.     FCPA and Woodley violated applicable rules and regulations with regard to owning an aircraft registered with the Federal Aviation Administrator ("FAA"). Specifically FCPA and Woodley, as owners of the Aircraft, violated regulations including but not limited to:

    a.   14 C.F.R. § 91.403, which requires the owner or operator of an aircraft to be primarily responsible for maintaining the aircraft in an airworthy condition;

    b.   14 C.F.R. § 91.405, which requires the owner or operator of the Aircraft to ensure that maintenance personnel make appropriate entries in the aircraft maintenance records indicating the aircraft has been approved for return to service; and

    c.   14 C.F.R. § 91.407, which mandates that no person may operate any aircraft that has undergone maintenance, preventative maintenance, rebuilding or alteration unless it has been approved for return to service by an authorized person and the required maintenance record entry has been made.

77.     FCPA and Woodley caused direct harm to Land 2 Air in that Land 2 Air would not have entered into the Aircraft Purchase Agreement had FCPA and Woodley informed Land 2 Air of the above-described problems with regard to the condition of the Aircraft.

78.     As a result of FCPA's and Woodley's negligence, Land 2 Air has been damaged. Specifically, having now been attritted, removed from service and deemed a "counterfeit," Land 2 Air is left with an Aircraft that can neither be put into service nor supplied Cirrus-certified parts or service. With entries reflecting the same in its logbook, the Aircraft cannot now be sold for anything greater than salvage parts, leaving Land 2 Air holding nothing more than an expensive paperweight for which it has incurred total costs in excess of $350,000.

79.     WHEREFORE, Land 2 Air demands judgment for its damages in an amount in excess of $75,000.00, including interest, costs, and attorney fees against the Defendants FCPA and Woodley, and for such other and further relief that this Court deems just and proper.

### COUNT IV: NEGLIGENCE / PROFESSIONAL NEGLIGENCE / NEGLIGENCE PER SE
### (Against Defendant Saker Aviation)

80.     Land 2 Air generally re-alleges paragraphs 1 through 79, as if full set forth herein.

81.     Saker Aviation is and advertises itself to be a specialist and/or expert that is certified to perform maintenance, repair and inspection work on aircrafts in a manner that complies with all applicable aviation standards, including but not limited to FAA standards.

82.     On two separate occasions, Saker Aviation performed an annual inspection of the Aircraft while the Aircraft was owned by FCPA/Woodley.

83.     On July 23, 2018, Saker Aviation performed a fifteen (15) hour annual inspection of the Aircraft. As a result of this inspection, Saker Aviation noted in the Aircraft log book, "I

certify that this aircraft has been inspected accordance for an Annual inspection . . . and was determined to be in airworthy condition."

84.    On April 9, 2019, approximately one month prior to the time Land 2 Air purchased the Aircraft from FCPA/Woodley, Saker Aviation performed an annual inspection of the Aircraft. Related to this inspection, Saker Aviation noted in the Aircraft log book, "I certify that this aircraft has been inspected per an Annual inspection and was found to be in airworthy condition."

85.    Upon information and belief, the two annual inspections performed by Saker Aviation both lasted twenty hours or less. A typical annual inspection of an aircraft similar to the Aircraft requires at least 50 hours. Cirrus' incomplete 2020 inspection was nearly 70 hours.

86.    When Land 2 Air had the next annual inspection performed on the Aircraft by the Cirrus facility in April 2020, Cirrus informed Land 2 Air that the annual inspection could not be completed and that the Aircraft could not be operated because it had previously been "attritted" by Cirrus. Cirrus explained to Land 2 Air that being "attritted" meant that the Aircraft had been added to an official listing of airplanes that were so substantially damaged or destroyed during an incident that Circus considered them to be un-airworthy and non-repairable, resulting in Cirrus permanently de-listing the airplane's serial number and removing it from service.

87.    Cirrus further explained to Land 2 Air that, because an attritted airplane was deemed to be non-repairable, any airplane bearing a de-listed serial number was also considered to be a "counterfeit airplane," which in turn meant that Cirrus would neither provide certified parts nor allow any certified work, including annual inspections, to be performed on such an aircraft.

88.    One of the many concerns Cirrus then identified was its discovery that the Aircraft's aileron cables (*i.e.* the cables that tether the wings and control their flaps) were not Cirrus certified

parts and did not comply with Cirrus's standards. Specifically, the aileron cables are required to be contained in a housing to avoid abrasion that could cause them to sever during flight. Upon inspection, the Aircraft's aileron cables were observed to be unprotected.

89.    Another concern was the condition of the Aircraft's firewall, which Cirrus pointed out was the original factory installed firewall that appeared to never have been replaced despite clear indications to Cirrus that the Aircraft had previously been involved in a crash.

90.    Perhaps most egregious was Cirrus' observation that the Aircraft had an obvious, unauthorized counterfeit wing assembly installed, which Cirrus determined was installed at a location other than Cirrus's Duluth, Minnesota headquarters—the only location in North America authorized to install wings for the Aircraft.

91.    Given the numerous issues, Cirrus's representatives expressed an overall disbelief that the Aircraft had passed any prior yearly inspections. As Cirrus explained it, any of the major issues discovered during its inspection—all of which appeared to Cirrus to have been at issue for some time prior to their inspection—could have served as the basis for Cirrus' decision to remove the Aircraft's serial number from service, a result that would have prevented any owner or FAA-certified mechanic from representing the Aircraft as being "airworthy."

92.    In performing the two annual inspections of the Aircraft prior to the annual inspection performed by Cirrus, Saker Aviation failed to identify and disclose numerous issues and problems regarding the Aircraft, as identified above.

93.    Saker Aviation violated applicable rules and regulations with regard to performing inspections and/or maintenance and/or repair work on the Aircraft. Specifically, Saker Aviation violated regulations including but not limited to:

a. 14 C.F.R. § 43.9, which requires each person who maintains, performs preventative maintenance, rebuilds, or alters an aircraft to make an entry in the maintenance record in the aircraft's log books which shall include certain information, including but not limited to a statement that the work performed on the aircraft has been performed satisfactorily;

b. 14 C.F.R. § 43.15, which requires each person performing an inspection of an aircraft to perform the inspection so as to determine whether the aircraft, or portions thereof under inspection, meet all applicable airworthiness requirements; and

c. 14 C.F.R. § 43.12, which expressly prohibits any person from making any fraudulent or intentionally false entry in any record or report that is required to be made, kept, or used to show compliance with any part of these regulations.

94.     In performing the July 2018 and April 2019 inspections of the Aircraft, Saker Aviation failed to exercise the degree of care ordinarily exercised by competent Aircraft professionals in the same community under similar standards of care.

95.     Saker Aviation negligently failed to perform the inspections in such a manner that discovered the obvious and serious problems with the Aircraft, including improper repairs and maintenance performed on the Aircraft and use of parts in the Aircraft that are not Cirrus-compliant and "counterfeit."

96.     Saker Aviation should have discovered the above-described problems with Aircraft and noted the problems in the Aircraft's log books, which Saker Aviation failed to do.

97.     Saker Aviation should not have noted in the Aircraft's log books that its inspections of the Aircraft resulted in a finding that the Aircraft was found to be in an airworthy condition.

98.     Saker Aviation owed a duty to Land 2 Air and any other potential purchaser of the Aircraft to advise the potential purchaser that they are purchasing an un-airworthy Aircraft that is unsafe to fly, and that flight in the Aircraft could result in serious injury or death due to known maintenance and repair issues related to the Aircraft.

99.     As a direct result of Saker Aviation's negligence, Land 2 Air has suffered actual and consequential damages. Specifically, having now been attritted, removed from service and deemed a "counterfeit," Land 2 Air is left with an Aircraft that can neither be put into service nor supplied Cirrus-certified parts or service. With entries reflecting the same in its logbook, the Aircraft cannot now be sold for anything greater than salvage parts, leaving Land 2 Air holding nothing more than an expensive paperweight for which it has incurred total costs in excess of $350,000.

100.    WHEREFORE, Land 2 Air demands judgment for its damages in an amount in excess of $75,000.00, including interest, costs, and attorney fees against the Defendant Saker Aviation, and for such other and further relief that this Court deems just and proper.

## COUNT V: FRAUD
**(Against Defendant Saker Aviation)**

101.    Land 2 Air generally re-alleges paragraphs 1 through 100, as if full set forth herein.

102.    As the entity that performed maintenance and/or repair and two annual inspections on the Aircraft prior to the Aircraft sale, Saker Aviation owed to Land 2 Air a duty of full disclosure with respect to any known problems with regard to the Aircraft.

103.    Representatives of Land 2 Air travelled to Saker Aviation's Garden City, Kansas location in lieu of performing an independent, complete inspection of the Aircraft prior to closing the sale.

104.     Knowing or suspecting that Land 2 Air was persuaded by FCPA/Woodley to forego its own independent, complete inspection of the Aircraft prior to closing the sale, Saker Aviation representatives met with Land 2 Air. The goal of Land 2 Air with regard to meeting with Saker Aviation was to ask questions of Saker Aviation about the Aircraft and to discover accurate information regarding the condition of the Aircraft.

105.     While at the Saker Aviation facility, Saker Aviation's representatives took the Land 2 Air's representatives through a detailed walk-through of the Aircraft's engine and airframe. During this time, Land 2 Air asked Saker Aviation questions about the condition of the Aircraft and Saker Aviation responded to every question by describing the good condition of the Aircraft. Saker Aviation did not disclose to Land 2 Air any of the above-described issues with regard to the Aircraft.

106.     At the meeting at the Saker Aviation facility, Saker Aviation informed Land 2 Air that because the Aircraft had its annual certification inspection on April 9, 2019 (performed by Saker Aviation), the Aircraft was both certified and airworthy.

107.     When questioned about the Aircraft's history, condition and airworthiness, Saker Aviation intentionally refrained from mentioning any of the above-described problems with the Aircraft.

108.     Saker Aviation's lack of transparency was done for the purpose or with the intent that Land 2 Air, an unsophisticated airplane purchaser, would forego conducting its own separate inspection in lieu of relying on the information and representations provided by FCPA/Woodley and Saker Aviation.

22

109.    At no point did Saker Aviation inform or otherwise make Land 2 Air aware that the Aircraft had possibly been seriously damaged or destroyed in a prior crash, or, consequently, had its serial number "attritted" by Cirrus.

110.    Saker Aviation had a duty to disclose to Land 2 Air the serious issues with regard to the Aircraft. When Land 2 Air asked questions to Saker Aviation with regard to the condition and airworthy condition of the Aircraft, Saker Aviation had a duty to disclose: a) the existence of extensive maintenance and repair issues with regard to the Aircraft, b) the existence of counterfeit/non-Cirrus compliant parts in the Aircraft, and c) the likely crash history of the Aircraft, or, consequently, the fact that the Aircraft's serial number had been "attritted" by Cirrus.

111.    In reliance on the information, disclosures and representations made by Saker Aviation regarding Saker Aviation's April 9, 2019 inspection, certification status and airworthiness of the Aircraft, Land 2 Air decided to forego performing its own independent inspection of the Aircraft and decided to move forward with the purchase of the Aircraft.

112.    Had Saker Aviation conveyed any of the withheld information regarding the numerous problems with the Aircraft, Land 2 Air a) would have performed its own independent inspection of the Aircraft prior to closing on the sale of the Aircraft, rather than just rely on Saker Aviation's representations regard the good condition and airworthy condition of the Aircraft, and 2) would not have moved forward with the purchase of the Aircraft.

113.    As a direct consequence of Saker Aviation's material misrepresentations and omissions, Land 2 Air suffered significant damages. Specifically, having now been attritted, removed from service and deemed a "counterfeit," Land 2 Air is left with an Aircraft that can neither be put into service nor supplied Cirrus-certified parts or service. With entries reflecting the same in its logbook, the Aircraft cannot now be sold for anything greater than salvage parts, leaving

Land 2 Air holding nothing more than an expensive paperweight for which it has incurred total costs in excess of $350,000.

114.    WHEREFORE, Land 2 Air demands judgment for its damages in an amount in excess of $75,000.00, including punitive damages, and including interest, costs, and attorney fees against the Defendant Saker Aviation and for such other and further relief that this Court deems just and proper.

**COUNT VI: VIOLATION OF OKLAHOMA'S
CONSUMER PROTECTION ACT
(Against FCPA and Woodley)**

115.    Land 2 Air generally re-alleges paragraphs 1 through 114, as if full set forth herein.

116.    At all material times, Defendants FCPA and Woodley, violated Oklahoma's Consumer Protection Act, Okla. Stat. tit. 15, § 751, et seq. (hereinafter "OCPA") throughout the transaction that is the subject of this cause of action.

117.    At all material times, Land 2 Air was and is a "consumer" and "person" within the meaning of OCPA.

118.    At all material times, FCPA and Woodley engaged in the knowing and intentional misrepresentation of facts material to the purchase and sale of goods in trade or commerce and to Land 2 Air's decision (and the consuming public's decision, for that matter), with respect to the sale of the Aircraft.

119.    Prior to and during the transaction that is the subject of this cause of action, FCPA and Woodley were well aware of and failed to disclose certain material facts regarding the Aircraft.

120.    If at any time prior to entering into the transactions at issue, FCPA and Woodley revealed to Land 2 Air the true facts, Land 2 Air would have: (i) explored other opportunities

regarding its purchase of an aircraft; (ii) would have declined to enter into any agreement with the FCPA and Woodley for the purchase of the Aircraft.

121.    At all material times, FCPA and Woodley by their conduct and by failing to disclose material information about the transaction at issue received a greater economic benefit than would be typical for the transaction.

122.    Such actions are deceptive and unfair, have mislead Land 2 Air, and are likely to mislead consumers engaging in similar transactions with FCPA and Woodley.

123.    At all material times, FCPA's and Woodley's conduct was deceptive, unfair, and unconscionable under the OCPA and poses a negative effect upon the market associated with the purchase and sale of aircrafts.

124.    At all times material hereto, the statutory breach committed by FCPA and Woodley as stated herein proximately caused damage to Land 2 Air in an amount to be determined at trial.

125.    WHEREFORE, Land 2 Air demands judgment for its damages in an amount in excess of $75,000.00, including punitive damages, and including interest, costs, and attorney fees against the Defendants FCPA and Woodley and for such other and further relief that this Court deems just and proper.

### **JURY TRIAL DEMANDED**

126.    Land 2 Air demands a jury trial on all issues so triable.

### **PRAYER FOR RELIEF**

WHEREFORE, Land 2 Air requests that the Court grant the following relief against Defendants:

(a)    That judgment be entered against Defendants in favor of Land 2 Air on all claims asserted herein;

(b)     That Defendants pay damages in an amount determined at trial, which damages

include, without limitation:

    i   Actual damages in an amount to be determined;

    ii   Punitive damages due to the knowing and willful nature of Defendants'

    conduct;

    iii  an award of Land 2 Air's costs and attorneys' fees; and

(c)     Judgment against Defendants granting such other and additional relief as is just and

equitable.

Respectfully submitted,

*/s/ Ashley M. Schovanec*
Cody J. Cooper, OBA No. 31025
Ashley M. Schovanec, OBA No. 32502
**PHILLIPS MURRAH P. C.**
Corporate Tower, Thirteenth Floor
101 North Robinson Ave.
Oklahoma City, OK  73102
Telephone: (405) 235-4100;
Facsimile: (405) 235-4133
cjcooper@phillipsmurrah.com
amschovanec@phillipsmurrah.com
***Attorneys for Plaintiff***
***Land 2 Air Investments LLC***